BEGHOLD v. AUTO BODY CO.[1]

1. NEGLIGENCE — VIOLATION OF STATUTE — DEFENSES — CONTRIBU-
   TORY NEGLIGENCE.
   The rule that a plaintiff cannot recover damages if his injury
   could have been avoided by the exercise of ordinary care on
   his part obtains in cases where the negligence of defendant
   is negligence in law, arising from violation of a statute.

2. SAME—INFANTS—CONTRIBUTORY NEGLIGENCE.
   Though the care required of infants is measured in some degree
   by age, experience, and intelligence, they may, as a matter
   of law, be guilty of negligence, if not too immature to under-
   stand the danger and the necessity of acting carefully.

3. MASTER AND SERVANT — PERSONAL INJURIES — VIOLATION OF
   STATUTE—CONTRIBUTORY NEGLIGENCE.
   Though plaintiff, suing for a personal injury, was employed in
   violation of the statute (Act No. 113, Pub. Acts 1901, § 3),
   which recognizes the immaturity of judgment of children
   under 16, he cannot recover for an injury received in conse-
   quence of his thrusting his hand into a planer head on the
   mistaken supposition that it was not running, knowing at
   the time all that the most experienced person could have told
   him about the danger of so doing.

4. SAME—VIOLATION OF STATUTE—INSTRUCTIONS.
   Evidence that plaintiff's brother stated that plaintiff was 16

[1]Rehearing denied October 4, 1907.

does not entitle defendant to an instruction relieving it from liability based on violation of the statute, if the foreman who employed him believed, and had good reason to believe, he was 16, where there is no evidence that plaintiff was asked his age, or that he knew of the representations said to have been made by his brother.

Error to Ingham; Wiest, J.   Submitted April 16, 1907. (Docket No. 20.)   Decided July 1, 1907.

Case by Carl Beghold, by next friend, against the Auto Body Company for personal injuries.   There was judgment for plaintiff, and defendant brings error.   Reversed.

Defendant is engaged in manufacturing automobile and buggy bodies, and other articles, using considerable machinery driven by steam and water power.   It operates a machine called a "sticker," or "molder," which has four knife-heads into which knives may be adjusted, and it smooths or dresses, in a single operation, one or more of the four sides of a piece of lumber.   Usually two persons operate the machine—the head man, who adjusts the knives, starts and stops the machine, and feeds it, and the helper, or tail man, who takes the lumber from the machine as it comes through, and piles it.   Plaintiff was employed by the defendant July 6, 1905.   He was not yet 16 years of age, having been born July 28, 1889.   He was set at work at the machine above described as tail man.   On the second day of this employment, towards evening, his right hand was so injured in the revolving knives of one of the side heads that the thumb and all the fingers of the right hand, with the exception of the little finger, with the palm of the hand, were required to be amputated.   Through his next friend he brought a suit for damages against the defendant, and recovered a verdict and judgment for $4,307.75.   The jury answered in the negative the question:

"Do you find that the plaintiff was guilty of any negligence, even though slight, which contributed to his injury?"

A motion for a new trial, based upon the single ground that the verdict was against the clear weight of the evidence, was made and was overruled.

It is averred in the declaration that defendant's establishment was a manufacturing establishment, and plaintiff was carelessly and negligently employed contrary to the provisions of section 3, Act No. 113, Pub. Acts 1901; that plaintiff was not properly instructed and warned with respect to the danger of his employment, which employment is alleged to have been to work in attendance upon said sticker or molder, to clean the same while in motion, and to take and receive from it such lumber, moldings, and material as were fed into and driven through and shaped by said sticker. When plaintiff rested his case, and again when the proofs were concluded, a motion was made to direct a verdict for the defendant, which motion was overruled. The court submitted to the jury the issues of fact:

" Was plaintiff when set at work by the defendant under the age of 16 years? Was the work given him to do dangerous to life or limb? Was he injured while about doing the work he was set to do? And was he exercising such care and caution as one of his age, intelligence, and experience ought to have brought to bear upon what he was doing when he was hurt?"

The reasons assigned in this court for a reversal of the judgment are:

1. That plaintiff was guilty of contributory negligence preventing a recovery.

2. That the court erroneously refused instructions preferred by the defendant.

3. Refusal to permit defendant's witness and foreman to answer the following question:

" Now, state, whether or not in your experience such an accident had ever before come within your knowledge."

4. The improper argument of counsel for plaintiff to the jury.

5. The verdict was against the weight of evidence, and the motion for a new trial should have been granted.

*Fred L. Vandeveer* (*Thomas, Cummins & Nichols,* of counsel), for appellant.

*Quincy A. Smith* and *Oscar J. Hood,* for appellee.

OSTRANDER, J. (*after stating the facts*).  The principal and meritorious question is whether plaintiff by his own negligence contributed to his injury.  It is necessary to go somewhat fully into the evidence, beginning with that which is undisputed.  Plaintiff worked at the sticker most of the time from the morning of the 6th to 5 o'clock in the afternoon of the 7th of July.  On the night of the 6th, when the machine was idle, he cleaned and oiled it.  He knew the work the machine did, and how it operated, the positions of the four knife-heads, the speed of the knives, the necessity for close observation to discover from the knives themselves whether or not they were in motion, and the danger of contact with them.  He had nothing to do with the adjustment or starting of the machine.  In beginning work, plaintiff reported to Urquhart, the foreman, who told him to go and help Ramsey, the head man on the machine, with whom plaintiff was acquainted.

Plaintiff testified:

"The work consisted of taking the sticks away from the machine and cleaning and oiling it.  The sticks that I took away I placed on a truck.  I didn't have anything to do with them afterwards, unless helping shove the truck to another machine.  The machine stood east and west, and I was placed at the west end.  The sticks were inserted or went in from the east end, and they came through to the west and were taken out and piled up by me.

"I went to work on the morning of the 6th and worked there all that day.  I had taken the sticks away, and I had oiled it, and I had cleaned it.  At night the first thing I cleaned it up ready for the next morning.  Before that time I had never looked at the machine.  I went back to work again on the 7th, and worked until about 5 o'clock, when I got hurt."

On cross-examination, plaintiff testified:

149 MICH.—2.

"*Q*. Of course, it would be necessary for Ramsey to tell you what to do; otherwise you would not have known, would you?

"*A*. I knew by what I saw of the boys in there. Mr. Ramsey told me what my work was, but did not tell me how to do it. He just told me to clean up the shavings and oil it. He did not tell me how to take them from the rear end and stack them on the truck I knew how to do that because he told me about the truck, and that was all there was to it, and I knew I had seen other boys put things on the truck. I knew what I had to do without being told.

"*Q*. He had to show you the places where to oil, or else you would not have known that, would you?

"*A*. No, sir; he did not show me very much. He just told me to oil the cups. He would not have to show the places to oil, as they were standing right out. He didn't give me any instructions at all about how to oil. * * * On the first morning that I went to work for the company, I went to tailing the sticker, which consists of taking the sticks away from the machine and putting them on the truck behind me. Ramsey told me to do that. In doing that work I was in no danger, standing behind the machine, and taking the sticks off it and putting them on the truck. It did not endanger my fingers doing that, because I simply took them up and put them on the truck, and it did not endanger my life. From that place I could oil the end head. That is not the head that I got cut on."

Early in the morning of the first day, plaintiff secured a piece of putty as large as a base ball, and put it in the blower hood, which comes down to and over the knife-head in question here. The head was not running, and there were no knives in it. Some one had thrown the putty at plaintiff, and he put it in the blower. Some time before 5 o'clock on the 7th, the head man, Ramsey, was obliged to adjust the knives and knife-heads to suit the dimensions of the material to be finished in the machine. In doing so, he stopped the machine, and plaintiff oiled it. Some pieces were put through the machine to test and correct the adjustment. The north knife-head, with knives, was running. Having adjusted the machine in

plaintiff's presence, Ramsey, for a moment, turned away. Plaintiff had been idle, and was seated on the truck. There was a newsboy in the room, with whom he exchanged some words. He left the truck, went around to the north side of the machine, put his hand in the knives, and was injured, as has been described. One person saw him when he was hurt. This man, working at another machine, saw plaintiff put the putty in the blower the day before, was impressed that the plaintiff was about to reach for it, cried out, and at the same instant plaintiff cried out on account of his hurt. The blower hood was a tin box, covering the knife-head in question, open toward the knives, and the lumber passing through the machine, and continued by a pipe leading away from the machine. It was from an inch and a half to two inches from the knife-head. It performed the office of sucking in and carrying away the shavings, dust, and chips made by the operation of the machine. No one but plaintiff knows whether he was reaching for the secreted putty when he was hurt. If he was, injury was certain. After plaintiff was hurt, bloody putty was found on the floor under the sticker head. This brings us to some statement of testimony not wholly undisputed.

Plaintiff, on direct examination, testified:

" Q. How did you happen to meet with the accident?

"A. I was sitting on the truck, and I jumped up to clean off the shavings on the surface of the machine.

" Q. And how did it happen that you brought your hand in contact with the knives?

"A. I was brushing off the shavings, and I was doing like that (indicating by a motion of his hand), and the head was right over there, and it took my hand right in that way.

" Q. Well, do you understand that the head that you struck your hand on—did you understand that it was running at that time?

" A. No, sir.

" Q. How long had that been running?

"A. About 15 minutes. It had not run before I had been there for about 15 minutes.

" *Q*. It had not run before during the time you had been there, do you say?

"*A*. No, sir.

" *Q*. Tell the jury what there was about the fixing of that head or setting it or starting it. What happened about that?

"*A*. The man went over it, went over the machine and run the machine.

" *Q*. Who was that?

"*A*. Mr. Ramsey. He put on the heads while it was idle, and put on the knives on the head and adjusted it right, and he stopped it a couple of times while he was doing this to get the right measure of the sticks, and then he would adjust it, and he done this a couple of times, and then he started it going, and I had cleaned the machine before while it was idle and oiled it, and he got some shavings on the surface by running these sticks through, and I got up and cleaned those shavings off. Ramsey had not said a thing to me advising that he had started the head, or that it was running, and I was not aware of the fact when I undertook to clean off the shavings. On the day before and the day that I was hurt I had cleaned and oiled the machinery while it was running and brushed off some shavings when Ramsey was there.    *    *    *

" *Q*. Could you readily discern without being careful in your looking whether or not the heads were running on it?

"*A*. No, sir.

" *Q*. For what reason?

"*A*. At a glance you would not know.

" *Q*. And why?

"*A*. Because they shine, and you would think they were just kind of metal and shine like a piece of iron there.

" *Q*. Well, what is the cause of that? Do they run fast or slow?

"*A*. They run, yes, they run awful fast. I did not receive any warning or caution or instructions from any one in the factory in regard to how I should conduct myself in order to avoid danger around the machine.

" *Q*. Describe to the jury what occurred at the time your hand came in contact with the knife-head. *    *    *

" *A*. There was a little paper boy in there. He was about six or seven feet of me, and I knew him real well, and I stepped over there, and I says, ' Hello, Basket,' and

asked him how many baskets he made, and he gave a laugh. I don't remember what he said, and I went back and sat on the truck, and I had the oil can in my hand, and I seen some shavings on the surface of the machine, and I set the oil can on the truck and reached with my right hand to brush the shavings off and got caught."

On cross-examination:

"*Q.* I believe you stated that you saw Mr. Ramsey running through a couple of boards and trying to adjust that head so it would properly perform its work?

"*A.* Yes, sir.

"*Q.* Did he say anything to you at that time?

"*A.* No, sir.

"*Q.* How long was this before you got hurt? But a moment or so?

"*A.* When he was running?

"*Q.* Yes.

"*A.* No, it was three or four minutes. At the time I was hurt I don't know where Ramsey was, nor if he had his back turned to me talking with another employé.

"*Q.* Did you have any conversation with him relative to this head before you got hurt?

"*A.* No, sir.

"*Q.* He did not say anything to you?

"*A.* No, sir.

"*Q.* And you were sitting down on the—

"*A.* Yes, sir.

"*Q.* And you saw some chips there that you wanted to brush away, and you got up to do that?

"*A.* Yes, sir.

"*Q.* Did you know where he was at that time?

"*A.* No, sir.

"*Q.* You haven't any recollection of seeing him for a few moments before that, have you?

"*A.* No, sir.

"*Q.* So, of course, he could not have given you any instruction about doing that work at that time?

"*A.* He could if he had wanted to.

"*Q.* Well, I mean he didn't, did he?

"*A.* No, sir.

"*Q.* Now, it was his duty to push this wood in at the opening?.

"*A.* Yes, sir.

"*Q.* And your duty to take it out?

"*A.* Yes, sir.

"*Q.* And you and he worked there as co-employés; you assisting him, and he assisting you by putting them up, and you taking it out?

"*A.* Yes, sir.  *  *  *

"*Q.* Before you put your hand there, did you stop to look to see whether or not those knives were in motion on the head?

"*A.* Why, I glanced at the machine, but I didn't know. I thought the machine had stopped.

"*Q.* Well, did you look to see whether or not it had stopped?

"*A.* No, sir.

"*Q.* You didn't?

"*A.* No, sir.

"*Q.* Now, you knew, of course, that that machine was used for the purpose of cutting chips away from the boards?

"*A.* Yes, sir.

"*Q.* And you realized if you got your fingers in there they would be taken off?

"*A.* Yes, sir.

"*Q.* You knew that, even though no one had told you about it?

"*A.* Yes, sir.

"*Q.* During the two days that you worked there prior to your accident, you stated that you could hardly tell the difference as to whether the heads were in motion, or whether they were standing still, because they were obliterated?

"*A.* Yes, sir.

"*Q.* Then you would have to take a chance and guess as to whether or not the heads were in motion?

"*A.* You would have to look at it very close.

"*Q.* And if you didn't look at it closely you would guess at it, wouldn't you?

"*A.* Why, I guess you would.

"*Q.* That is so, you would have to?

"*A.* Yes, you would have to look at the belt to see whether it was running.

"*Q.* If you should look at the belt, could you tell whether or not it was in motion?

"*A.* Yes, sir.

"*Q.* Because the belt would be going?

"*A.* Yes.

"*Q.* How far would you have to move to look at the belt? Just simply step over a foot or two?

"*A.* You would have to step over and look right around.

"*Q.* And then you could see it?

"*A.* Yes, sir.

"*Q.* Now, in moving this chip you could have taken a small stick and knocked it off, couldn't you?

"*A.* Yes, sir.

"*Q.* And the machine could have been stopped also, couldn't it?

"*A.* Yes, sir.

"*Q.* And if you had done either of those there would have been no danger to your fingers?

"*A.* I thought the machine had stopped.

"*Q.* Well, I say, if either of those had been done then there would not have been any danger to your fingers?

"*A.* No, sir.

"*Q.* Because then the machine would not have been in motion, that is true, isn't it?

"*A.* Yes, sir.

"*Q.* You said a few moments ago that you saw Mr. Ramsey testing that knife-head?

"*A.* Yes, sir.

"*Q.* It was in motion at that time?

"*A.* No, sir.

"*Q.* Well, it had been previously?

"*A.* No, sir.

"*Q.* Well, how did he know that it would not successfully perform its work, then, if he had not tested it?

"*A.* I don't know.

"*Q.* Isn't it true, a few moments before, that he did run it; he would run it, and then he would stop it, and he would keep on doing that until he got the machine in the order he wanted it?

"*A.* Yes, sir.

"*Q.* And how many times do you think he had stopped it?

"*A.* Once or twice.

"*Q.* And each time he had started it up and ran some pieces through to see if it was doing all right, didn't he?

"*A.* Yes, sir.

"*Q.* That is the way he does that?

"*A.* Yes.

"*Q.* But at the time you got hurt you say you don't know whether it was running or not?

"*A.* Yes.

" *Q.* But you could have ascertained if you had looked at the belt easily ?

" *A.* Yes, sir.

" *Q.* And that you simply took the chance and thought it was not running when you tried to wipe the chip away ?

" *A.* I did.   I didn't see any danger."

Ramsey testified that he told plaintiff, upon setting him to work :

" Now, young man, you want to be careful and keep your hands off from this machine while it is running ; if you don't it will cut you, if you get your hands on it. * * *

" *Q.* Did you ever give this boy, the plaintiff in the case, any instructions about, or requests about, oiling and cleaning the machine while it was in motion ?

" *A.* I did not.

" *Q.* Did you ever see him do it ?

" *A.* I did not.

" *Q.* Did you ever request him to take chips from off the bed of the machine while the heads were in motion ?

" *A.* No, sir.

" *Q.* Was there any necessity for it ?

" *A.* There was not.

" *Q.* What if chips accumulated on the bed of the machine, would that in any way interfere with the passage of the board through it ?

" *A.* It would not.

" *Q.* What would occur if a board would happen to strike those chips?

" *A.* Simply shove it out of the way.

" *Q.* Would it push it through the machine and let it fall on the floor ?

" *A.* It would be according to where the chips struck. If it struck on the back head, it would push it up until it came to the bottom of the head, and it would drop down through.   * * *

" *Q.* I wish you would narrate what you know about it to the jury.   Give them as much information as you can about it.

" *A.* Well, after starting up that afternoon and running through those 150 pieces, one man had run with me, and I had occasion to stop and oil occasionally, and I stopped the machine and told the young man to oil it up,

and he did so, and I came back and started the machine and run one piece through, stepped to the back end of the machine, and took the measurement to see that all was well, and I finds it was all right. I turned around and spoke a few words to Jim Noble, possibly talked to him a quarter of a minute. The boy at that time was sitting on the truck, and after I finished my talk with Mr. Noble I turned my back to the young man and took a chew of tobacco, and whirled around on my heel and grabbed the foot lever to throw it in gear to start the timber on through, and just as I put my hand on the lever, I heard the head stop, and I looked around and I saw the young man was fast, and I immediately run around where he was and grabbed his hand. The head had stopped.

" Q. Did you go over to the doctor's with him?

"A. I did.

" Q. Did you at that time have any conversation with him relative to the way in which he sustained his injury?

"A. I did.

" Q. What did he say about it?

"A. I said: ' Carl, how did you get hurt?' He said: ' I forgot the machine was running.' "

Witness Noble, who saw the plaintiff at the moment of injury, testified:

" Q. Did you see the accident occur that occurred to this boy?

"A. I saw it.

" Q. What were you doing at that time?

"A. Wiping out a box on my machine.

" Q. How far away were you?

"A. About 10 feet.

" Q. Describe as nearly as you can the circumstances leading up to this accident.

"A. Well, in the first place, I had a hot box on my machine, and I took the box off, and was wiping it off, and I set down on the corner of my bench wiping it off, and I went over to Ed, and spoke to him, that is, I said, I can't remember about all the talk, and—

" Q. Who do you mean by Ed?

"A. Mr. Ramsey; he was sitting on a car right back of the sticker, and I went back again. I was only about a quarter of a minute or so, and I went back, and Ed had been running a piece through the machine, and I guess

he had run 150 pieces of them, and when I went back I noticed Ramsey turn around and take a chew of tobacco, and then his back was turned.   Well, in the first place, a newsboy came in and brought my paper, and Carl slung a block at the newsboy, and the newsboy asked me who slung the block, and I told the boy that Mr. Brackett slung the block.   He is the man that run the band saw, and the boy turned around with a kind of a smile.   He didn't do any more.

" *Q.* Well, who did actually throw the block ?

" *A.* Well, Carl threw the block; I seen him.

" *Q.* How did you happen to make the statement that Mr. Brackett threw the block ?

" *A.* I done it as a joke more than anything else, because the little newsboy was always laughing when he came in.

" *Q.* What was Carl doing just before the accident occurred ?

" *A.* Sat on the car.

" *Q.* What do you mean by car ?

" *A.* The truck they pile the stuff on.

" *Q.* What caused him to get up and go to the north head ?

" *A.* Well, I could not say what caused him to get up; but the newsboy kind of stepped over to the other side, and when he stepped over there, he stepped over to the other side of the band saw, and when he stepped over there Carl jumped off the car quick, and he came around the side of the machine and stuck his hand in the head. When he stuck his hand in the side of the head, he hollered, or I hollered, and then he hollered.   *   *   *

" *Q.* When this boy came up from the—got up from the truck— I understand you to say he got up and ran around the rear of the machine and put his hand into the head ?

" *A.* He went around the side of the machine.

" *Q.* Around the side of the machine ?

" *A.* Yes.

" *Q.* Did you see him brush any shavings away from in front of that ?

" *A.* No, it was done too quickly.

" *Q.* Did you assist in taking his hand ?

" *A.* I did.

" *Q.* From out of the knives ?

" *A.* I did.

" *Q.* How long had you worked in the vicinity of that machine prior to this accident ?

" *A.* I should judge eight months, or a year.

" *Q.* Did you work for the two days before the boy got hurt ?

" *A.* Yes, sir.

" *Q.* During that time did you see him oiling the machine or cleansing it while it was in motion ?

" *A.* Not when it was in motion; no, sir.   *   *   *

" *Q.* You saw Carl about to make some motion towards the knife-head with his hand, did you not, before he did get caught ?

" *A.* No, sir; he immediately got up and came around and stuck his hand in the machine. It was done so quick, just as quick as that. There was no brush."

Plaintiff lacked but a few days of being 16 years of age. In school, he had gone to the eighth grade, and had had a little algebra. At the trial, nine months after he was hurt, he was 5 feet 8 or 9 inches in height, and weighed, when he was injured, 130 pounds. He was in possession of his faculties and the enjoyment of his senses. His answers to questions asked him upon the trial indicate intelligence. His action which resulted in injury was voluntary, intentional. Whether he intended to get the putty, or to brush off the shavings, he did what he intended to do. He supposed, he says, that the machine had stopped. He acted upon this assumption. In entertaining it, he was misled by no one, did not fail in appreciating the danger from the machine when in motion, was influenced by no failure to warn him, would not have been restrained by any warnings or instructions given him in entering the employment. If he had not entertained the idea that the knives were not in motion, it may be assumed that he would not have been hurt. The exercise of the most ordinary care would have prevented the injury. He was needlessly, inexcusably careless. The general rule is that a plaintiff cannot recover damages if the injury could have been avoided by the exercise of ordinary or reasonable care on his part. This rule obtains in cases where the negligence of defendant is negligence

in law, arising from violation of a statute. 1 Thompson on Negligence, §§ 210, 211; 2 Labatt on Master & Servant, § 651; 1 Bailey on Personal Injuries, § 1290 et seq.; *Queen* v. *Iron Co.*, 95 Tenn. 458 (30 L. R. A. 82); *Thompson* v. *Edward P. Allis Co.*, 89 Wis. 523; *Reynolds* v. *Hindman*, 32 Iowa, 146; *Taylor* v. *Carew Manfg. Co.*, 143 Mass. 470; *Sterling* v. *Carbide Co.*, 142 Mich. 284; *Roberts* v. *Food Co.*, 142 Mich. 589. And while the care required of an infant is measured in some degree by age, experience, and intelligence, courts have many times determined, as matter of law, that they were guilty of negligence (*Henderson* v. *Railway Co.*, 116 Mich. 368; *Berlin* v. *William B. Mershon & Co.*, 132 Mich. 183; *Hess* v. *Woodenware Co.*, 146 Mich. 566; *Roberts* v. *Food Co.*, supra), or were not too immature to understand the danger and the necessity for acting carefully (*Borck* v. *Nut Works*, 111 Mich. 129; *Palmer* v. *Harrison*, 57 Mich. 182). In each of the cases of *Sterling* v. *Carbide Co.*, supra, *Ertz* v. *Pierson*, 130 Mich. 160, and *Allen* v. *Jakel*, 115 Mich. 484, the plaintiff was, as here, under the age of 16 years. In *Ertz* v. *Pierson*, and in *Allen* v. *Jakel*, it was held that whether reasonable care required that instruction should have been given to plaintiff as to the manner of doing the work was a question for the jury. In those cases, and in *Sterling* v. *Carbide Co.*, plaintiff was employed to operate dangerous machinery. The employment was dangerous, and certain dangers were obvious. It was said in the opinion in *Allen* v. *Jakel:*

" It sometimes happens that the dangers of a tool or machine are obvious, yet some methods of use are much safer than others. Skill and dexterity are essential, and prudence dictates that inexperienced persons, especially young children, should have some instruction or opportunity to learn the proper way before they are allowed to attempt to use them. Whether this was such a machine, and whether the opportunity for observation was all of the instruction reasonably necessary, were questions to be submitted to the jury, not being sufficiently clear to war-

rant us to dispose of them as questions of law, arising upon undisputed facts."

These cases and the case at bar are distinguished by the fact, among others, that in the instant case, with respect to the particular action which resulted in injury, plaintiff knew all that the most experienced person could have told him.    Observation must in every case follow upon instruction, and knowledge, however acquired, must be applied.    Plaintiff exercised no judgment.    There is no reason for doubting the truth of his own statement.    He put his hand in revolving knives, supposing they were not revolving; knowing then, as well as he knows now, that if they were revolving he would be injured; knowing that whether they were revolving or not could be determined only by close observation of the knives themselves; knowing that by a mere glance at the belt he could determine the fact absolutely.    Although the employment of plaintiff was in violation of a statute, and, let it be added, of a statute which recognizes the fact that a boy under the age of 16 years is more likely to act from impulse and with less judgment than a man, the injury is so clearly one resulting entirely from the carelessness of plaintiff that the court should have withdrawn the case from the jury.

It is proper to say that in our opinion none of defendant's request to charge which should have been given were refused, although in some cases the precise language of the request was not employed.    The court refused to instruct, as requested, that:

" If defendant's foreman who employed plaintiff had reason to believe, and did believe at the time he employed him, he was above the age of 16 years, then such employment would not be contrary to the statute, and plaintiff cannot recover on the ground that he was employed at employment dangerous to life and limb when under the age of 16 years "—

But instructed that:

" If the boy was in fact under the age of 16 when hired

by defendant, and was set at work dangerous to life or limb, it does not remove the bar of the statute for defendant to show that it believed him to be above 16, or that the brother told defendant the plaintiff was 16."

Whether plaintiff's own representations as to his age, aided by corroborating evidence, would in any case estop him to assert the statutory negligence of defendant, is a question not presented. It is not charged that defendant wantonly or willfully, but only that it carelessly and negligently, violated the statute. The testimony for defendant is that plaintiff's adult brother, who applied for work for him, and himself was employed in the same establishment and in the same room, stated to the foreman of defendant, who hired the boy, that he was 16 years of age, and that to the foreman he looked to be over 16 years old. There is no evidence that the boy was asked his age, or that he knew of the representation said to have been made by his brother, and the fact that any inquiry was made, and that the brother made any representations about the matter of age, is expressly denied. Under these circumstances, the instruction given was a proper one.

The testimony excluded was immaterial. The argument of counsel for plaintiff to the jury was, some of it, clearly improper, calculated to prejudice the jury, and was persisted in after repeated rebukes and admonitions from the court.

It is unnecessary to further characterize it, since, because of the error pointed out, the judgment is reversed, and a new trial granted.

McALVAY, C. J., and MONTGOMERY, HOOKER, and MOORE, JJ., concurred.