PEQUIGNOT *v.* GERMAIN.

MASTER AND SERVANT — CONTRIBUTORY NEGLIGENCE — INFANCY — STATUTES.

> Evidence that plaintiff was 16 years old at the time he was injured, that he had been employed in work at the saw which caused the injuries on numerous occasions previously, that the saw was guarded but the guard had been left up so it did not protect plaintiff, that although it was not necessary to bring his hand nearer than three inches from the saw, in pushing a piece of soft lumber through it, he received an injury to his hand which, his testimony tended to show, resulted from the saw striking a knot and from plaintiff's failure to release the pressure in time to avoid having his hand forced against the saw, required the direction of a verdict for defendant on the ground that plaintiff was guilty of negligence contributing to his injuries.[1]

Error to Saginaw; Gage, J. Submitted April 9, 1913. (Docket No. 11.) Decided September 30, 1913.

Case by Willard Pequignot, by his next friend, against Edward Germain for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Weadock & Weadock,* for appellant.

*A. Elwood Snow,* for appellee.

MOORE, J. The plaintiff, a minor, by his next friend, brought suit under Act No. 220 of the Public Acts of 1911 (2 How. Stat. [2d Ed.] § 4017 *et seq.*),

---

[1] The question whether one employing child under statutory age may rely on contributory negligence to defeat liability for personal injury to latter, is treated in notes in 12 L. R. A. (N. S.) 461 and 20 L. R. A. (N. S.) 876. And as to presumption and burden of proof as to capacity of minor servant to comprehend and avoid danger, see note in 29 L. R. A. (N. S.) 487.

prohibiting the employment of male persons under the age of 18 years at hazardous employment, to recover damages for the cutting off of the first and second fingers of his right hand at about the middle joint. From a judgment in favor of the plaintiff, the case is brought here by writ of error.

At the conclusion of plaintiff's testimony, and again at the close of all the testimony, defendant asked for a directed verdict, which was refused. Counsel for appellant in the brief say:

"The errors complained of are because of rulings on the misconduct of plaintiff's counsel in arguing the case, refusal to take the case from the jury at the conclusion of plaintiff's case and at the end of the whole evidence, in refusing to give defendant's written requests to charge, and to the charge as given. There are 24 assignments of error, upon all of which defendant relies, excepting the first, fourth, fifth, sixth, and eleventh, which are abandoned as not sufficiently prejudicial to justify reversal."

The accident happened December 7, 1911. The plaintiff was born January 22, 1896, and was given an employment permit under section 10, Act No. 285, of the Public Acts of 1909, dated December 29, 1910. Photographs of the saw and table where the injury occurred were offered in evidence, and show that a guard was on the table, and when in position came down over the saw, so as to be as effective as a guard could well be. The board which plaintiff was holding when hurt is in evidence. It is a soft pine board, with a hard knot in it about two inches in diameter, through which the saw passed. The plaintiff pushed the board through to the end, cutting off a strip about two inches wide.

In our view of the case it is desirable to quote freely from the testimony of the plaintiff. He testified in part as follows:

"I am the plaintiff in this case. On the 7th day of

December, 1911, I was employed by Mr. Germain, the defendant in this case, in the cutting room in Germain's factory on Holland street in the city of Saginaw. I was working on the rip table on the 7th day of December, 1911. I had been working on that rip table about two days. I first went to work on the rip table the day before. * * * Two fellows were cutting up lumber. I was taking it and ripping it up into most any size, to get the best out of it. The size of this particular piece that I was sawing at the time of the injury must have been about 12 inches wide, about 18 or 19 inches long, an inch and a half or quarter thick, or an inch and a half. I was required to rip off the worst. * * * The guide was about 2 inches from the saw. I had little sticks to place in between the guide and the saw, and place the board up against when I pushed in here. By that adjustment I could saw off any width piece off the board I wanted to. I took the board; laid it so. I wanted to work off the piece. It was about 12 inches wide. I wanted to rip a 2-inch slab off it. The saw choked. I gave it a shove. It choked. I shoved it, and my hand got on the saw and cut a couple of fingers off.

"*Q.* How did you place the board there?

"*A.* Thumb on the back, two fingers and the thumb on the back of the board, two fingers on the back, two on the side, and pushed it down at the same time, and shoved this through. It choked up, and the board jumped up. It came and shoved it over, and knocked my hand over some way, and my hand got in the saw. It happened so quick I don't hardly know how it did it. It cut a couple of fingers off.

"*Q.* Show them to the jury. (Witness does as requested.) They were cut off at about the middle joint, two fingers, first and second on my right hand.

"*Q.* State how the saw was worked at the time of the injury, at the time you were ripping this particular board.

"*A.* Why, I put the board on the table, and was going to rip off a piece 2 inches. The saw started to choke and jump. The board throwed my hand over off the board. At the time this injury happened, the board jumped up and down. I held it down, shoved it through.

"*Q.* Explain how you came to get your fingers taken off.

"*A.* It happened so quick, I couldn't say just how it happened; but I know that the piece I ripped about 12 inches wide. I ripped off a piece 2 inches. I started to rip it; ripped a little way; it started to jump; the board jumped up and down; I stood there; it gave a jump; it went right over; it jumped all the way over. I don't know just exactly how it jumped up, and my fingers was cut off. I was paying attention to my business at the time. There was a spreader on here, a guard, I think a half an inch, here below the board it would be 9 or 10 inches, and then there was a spreader in there. It is kept on there to keep from closing in on the top, and the spreader, there is a guard about a half an inch wide, sort of a guard. It is supposed to come from the top here. It is about a half an inch from the top of the saw. The guard on the saw I was working on was up about 5 or 10 inches from the saw. It wasn't put down where it belonged.

"*Mr. Weadock:* I object to that; no allegation as to that.

"*The Court:* You don't claim anything about furnishing proper guard for the saws?

"*Mr. Snow:* No; only to guard the machine.

"*Mr. Weadock:* I object to that as wholly incompetent and immaterial under the declaration.

"*The Court:* As long as counsel says he doesn't claim anything for it, I don't see how it is improper. He says he doesn't claim anything about furnishing the proper guards for the saw.

"*Mr. Weadock:* It might be prejudicial when it goes to the jury.

"*The Court:* So far as the question of the saw being properly guarded, I now instruct the jury that they should not consider this testimony.

"*Q.* Did you, before you worked on this particular saw, work on a ripsaw?

"*A.* I worked on one ripsaw. Ripped organ parts about a week, but not steady. It might have been more than a week; it might have been less. I didn't keep track of the time. I didn't keep track of it. I worked a day or so, and then back on the other place where I belonged. Maybe I would go back again and work a half a day or so.

"*Q.* Was it a saw similar to this one you happened to be injured upon?

"*A.* The table was higher and bigger. Instead of having a guard or the board you had one you could move any place you wanted to rip the board. At the time when I went to work on this saw it was running. I don't know I couldn't say how fast it would revolve.

"*Q.* How long had you been employed by Mr. Germain? How long had you worked there?

"*A.* Pretty close to 2 years and perhaps 8 months. I went to work in vacation."

He modified this statement later, to the effect that he did not work all the time. On cross-examination he said in part:

"I attended school a little over eight years. I went through the eighth grade, a couple of weeks in the ninth grade. While I did attend school, I attended practically all the time. When I left the eighth grade, I was promoted to the ninth grade. * * *

"*Q.* The manual training school?

"*A.* Yes.

"*Q.* Did you attend the manual training school part of the time?

"*A.* Yes.

"*Q.* How long were you at the manual training school?

"*A.* Two or three weeks is all. I didn't keep track of the time.

"*Q.* You were a member of the ninth grade manual training school?

"*A.* Yes.

"*Q.* You commenced taking what course?

"*A.* Machinist. It is a mechanical course. * * * I quit school in 1910.

"*Q.* And you applied to the inspector, the factory inspector, for permission to go to work?

"*A.* I was working there at Germain's—it was a little time before Christmas.

"*Q.* You remember going and getting a certificate?

"*A.* After I worked in the factory, he asked me how old I was. I told him, and then he sent me for one in December, just before Christmas. * * * I

took it to Germain's mill. I didn't know who I gave the paper to. I took it in the office. I filed it in the office of Mr. Edward Germain, and this is my signature here. I remember that, because there is a blot.

"*Q.* At the time this was delivered to Mr. Germain, your height was 5 feet 6 inches?

"*A.* They measured me.

"*Q.* Your weight was 136 pounds?

"*A.* That is what I weighed then. I am now 5 feet 8½ inches tall.

"*Q.* Mr. Pequignot, what did you first do at Mr. Germain's mill in 1910?

"*A.* Worked at the box factory; did a little of everything; took away from the cut-off saw, and done sawing on the ripsaw."

He then testified in detail as to the work he did, showing that he worked on a ripsaw at various times.

"*Q.* How long did you work at this particular ripsaw you were hurt at?

"*A.* Oh, I should judge a day and a half or two days.

"*Q.* It was like the other ripsaws you had worked on?

"*A.* Same as a ripsaw.

"*Q.* This one you were hurt at, was there a guard on it?

"*A.* No, sir; there was one there, but about 9 or 10 inches from the top of the table. There was a guard on it, while I was working on it.

"*Q.* And the other machine that you were working on?

"*A.* Why, all that could be done to them; yes.

"*Q.* You are now shown what purports to be a picture. Look at that, and see if that is not a good representation of the ripsaw that you were injured on.

"*A.* It is the same saw, but the hood is down. That was standing almost up and down on the saw. Ever since, while I ran it, it was leaning up that way. The fellow that ran it before I did left it that way. I did not know how to put it down. It was fixed up that way when I started on it. I didn't know how it was to be. This picture shows the same saw. It is down on that. \* \* \*

"*Q.* That picture shows substantially the correct position of the operator when he is at work here, doesn't it? (showing Exhibit 'B' to witness).

"*A.* Why, it is all right. It is not the way I always do it. I had my hand on top of the board, flat. I said something about the saw getting choked at the time of my accident. The piece of board that I was sawing was pine, and was less than 2 inches. It was over an inch and a quarter; less than 2 inches. I am sure it was no less than an inch and no more than 2 inches. When I was operating on this board, the saw would be in the middle, the guard on this side, 2 inches from the saw. It is only about 2 inches square, so it would be here possibly 2 inches from the saw. I would put the board like that; shove it through there. If there was a small notch on the edge, you put that against your saw. You shove the board away from you all the time.

"*Q.* All you had to do was to hold the board in its place until the saw went through it?

"*A.* Hold the board down; hold it against your guard and shove it through.

"*Q.* You done that by holding the board steady?

"*A.* Yes, and one hand on it.

"*Q.* And the guard protected it on the other?

"*A.* Yes, and to shove it up against the guard.

"*Q.* So there was only one hand on the board when you pushed it through?

"*A.* Yes; I pushed it in that way I illustrate.

"*Q.* If you see that it clogs, what do you do then?

"*A.* Why, if I was feeding the boards too fast, I wouldn't shove it through so fast. The only way it became clogged is by shoving it too fast or if the saw gets dull.

"*Q.* If you shove it too fast, you restrain it, and if it strikes about sometimes?

"*A.* Yes.

"*Q.* Then the way to do that is to start it again and go easy until its gets through the knot? This board you had that day do you think had a knot?

"*A.* Yes; I am sure it did. That is why I ripped a 2-inch piece off to get the knot off. I tried to get rid of the knot. I didn't look at the board to see if I got it ripped off or not. If I don't do it, I would take it off afterwards.

"*Q.* You had sawed through the knot before you got hurt? That knot was about a third or a half way of the board?

"*A.* In the middle or a third across there.

"*Q.* Near the middle?

"*A.* I didn't notice. I noticed a knot in the board. I don't remember just where that knot was. It wasn't in the end of the board, I know.

"*Q.* Did you finish ripping this board when you got hurt?

"*A.* Yes, sir.

"*Q.* Now, as a matter of fact, the saw was neither choked nor into a knot at the time you were hurt, isn't that true?

"*A.* If it ripped through the board, and yet going as fast as it could go, it wasn't choked down.

"*Q.* The saw was neither choked nor in a knot at the time you were hurt?

"*A.* No, sir; it was not in a knot.

"*Q.* It wasn't choked?

"*A.* It wasn't choked. * * *

"*Q.* You don't know how you got your finger hurt, do you?

"*A.* No, sir.

"*Q.* Now, I show you a board, and ask you to look this over, and ask you whether or not that is not the same board you were working at at the time you got injured.

"*A.* Well, that is the same kind of a board. * * *

"*Q.* Just show the jury how you put that board through.

"*A.* This is the guard. Standing as I am, the guard is on the left-hand side. I pushed the board towards the saw as it goes through it until it gets clear to the end.

"*Q.* Then you take off your hands?

"*A.* Like this, up like this.

"*Q.* Your hand, at the time you got your fingers cut, were on the end?

"*A.* No, sir.

"*Q.* Where that stain is?

"*A.* No, sir; my hand was right here. The last time that dropped off there.

"*Q.* How it was dropped off you don't know?

"*A.* That jumped when it struck that knot.

"*Q.* You had gone through the knot at the time of the injury?

"*A.* Yes, sir.

"*Q.* After you got through the knot, it sawed right along just as it had before it came to the knot, without any jump?

"*A.* Yes.

"*Q.* You see it doesn't show any jumping at all on the edges?

"*A.* That is as—

"*Q.* If it jumps, it makes an extra dig?

"*A.* Yes; there is where it runs.

"*Q.* If it chokes, it makes a bigger nick?

"*A.* Yes.

"*Q.* Look at that carefully, and tell us if it is not true that that board was in just that condition when it went through the saw, just like that.

"*A.* I don't know whether that was·the top of the board or not.

"*Q.* Now, your fingers were not necessarily, in the operation of the saw, in any way connected with or touching that saw?

"*A.* No, sir.

"*Q.* And it was not intended that, in running the board through, your fingers would come near the saw?

"*A.* It was sometimes, and sometimes it was not.

"*Q.* In the regular operation, your fingers would not come near the saw?

"*A.* No, sir.

"*Q.* You may have slipped at the time you got injured. May not your foot slipped or something?

"*A.* No, sir; I am sure I didn't slip anyway, my foot, nor nothing.

"*Q.* You don't know now how you got your fingers connected with the saw?

"*A.* No more than what I just said, no more than that.

"*Q.* How many ˙different times did you work on the ripsaw, like this one that you were hurt on, while you were there? Fifty different times?

"*A.* No, sir. I wouldn't try to say how many times it was, I am sure. I never worked on a ripsaw. It wasn't over a week or a week and a half.

"*Q.* You knew how, of course, how to run this ripsaw?

"*A.* Yes. * * * What I was doing at that time was making pieces about 2 inches wide. The entire length of this board is 18 or 19 inches.

"*Q.* Was this guard turned back, or was it standing up in the air?

"*A.* I couldn't say if it was turned back. Somebody stuck it up that way; it was sticking up in the air.

"*Q.* You knew what the guard was for?

"*A.* Yes.

"*Q.* And how it could be put down from the air?

"*A.* I couldn't tell. All the others I have worked on it was put down.

"*Q.* You said nothing about it being up that way?

"*A.* No, sir; a man worked on it, I thought it would be all right; he told me to. * * *

"*Q.* You were running ripsaws for a number of days before you were hurt?

"*A.* From time to time. I know Mr. William Duboi.

"*Q.* Do you remember applying to him to permit you to work on the ripsaws?

"*A.* I never asked him for a job; no.

"*Q.* Didn't you tell him some weeks before you were hurt you could do that work, you wanted a chance to run the ripsaw, and he did then permit you to, and from that time on until you got hurt you did run it?

"*A.* I don't think so.

"*Q.* Would you say you didn't ask Mr. William Duboi for permission to run ripsaws?

"*A.* That is the way I generally worked on it. I don't remember. The first I remember of working for him on the saw, there was nothing to do in our place. I went over there to work for him. I don't know just why I come to go over there.

"*Q.* How long before you were hurt was that?

"*A.* I couldn't say how long it was. It must have been over a month before.

"*Q.* The work you then asked him to do was on the ripsaw?

"*A.* Yes.

"*Q.* From that time until you were hurt you had from time to time worked on ripsaws?

"*A.* Yes, sir.

"*Q.* You knew that that hood or guard that was put over the ripsaw was for the purpose of protecting the man that was running it, didn't you?

"*A.* Yes, sir.

"*Q.* You said yesterday that when you went to the ripsaw at which you were hurt that this guard was kept upright?

"*A.* Yes.

"*Q.* I now show you a guard. That is the kind of a guard that was on this saw that you were at work on that day, wasn't it?

"*A.* About the same; yes.

"*Q.* That guard as it now is on the board is in the position it would be when the operator was running it?

"*A.* That is the correct way.

"*Q.* When a man is running the board through it, and when it is operated on? When you said yesterday you couldn't move the guard, you mean this piece, the upright guard?

"*A.* I don't know how they moved that. The saw was running. I didn't fix up the table.

"*Q.* When, if at all, the top part, the part that extends out over the saw, is moved, it is done by pushing it up that way?

"*A.* The other guard was somewhere—

"*Q.* It stood up substantially the same way this did?

"*A.* Yes.

"*Q.* If the operator wanted to push it back, he would do it in that way?

"*A.* Yes.

"*Q.* Is that the position in which this guard was when you were operating this saw?

"*A.* Yes, sir.

"*Q.* You knew that you could put it down that way?

"*A.* You could not put it down.

"*Q.* Did you try to?

"*A.* I don't remember it.

"*Q.* You knew that that guard was up there for the purpose of protecting the employees?

"*A.* Yes.

"*Q.* When you went there to it, it was standing up?

"*A.*    Yes.

"*Q.*    And you didn't try to put it down?

"*A.*    Yes.

"*Q.*    You knew, when the operator was using this saw without the guard, there was more chances for his getting his hands cut than there was with the guard down?

"*A.*    Yes.

"*Q.*    And you continued to operate the saw for those days with that knowledge?

"*A.*    Yes.

"*Q.*    And the difference was, when the guard is down, the whole saw is covered, isn't it, and the only space between the guard and this board that the board you are ripping rests on is as shown here, 1¾ inches, perhaps?

"*A.*    Yes.

"*Q.*    The only chance for one to get his hands in would be under the top end of this guard?

"*A.*    That is about the only way.

"*Q.*    There would be no chance at all to get struck on the top of the saw when the guard is down?

"*A.*    No, sir.

"*Q.*    You knew in the operation of the cutting of the board that the saw worked towards you all the time?

"*A.*    Yes.

"*Q.*    Now, then, when you were putting this board through the saw, the same was revolving towards you very fast?

"*A.*    Yes.    *    *    *

"*Q.*    You knew, as you pushed this board through, that cut the board, of course?

"*A.*    Yes.

"*Q.*    When you pushed the board through, as you illustrate, your hand would be on the right-hand corner of the piece, away from the saw?

"*A.*    Yes.

"*Q.*    And that is the only place you touched your hand on the board?

"*A.*    Yes.

"*Q.*    The small piece being sawed was being held in place by the guard on the side?

"*A.*    Yes.

"*Q.* You simply put the board through by pushing by one hand until it was sawed through?

"*A.* Yes. * * *

"*Q.* Having this board in mind, that it was the one that you were on at the time, the saw having gone clear through this board, your hand, I suppose, was how many inches from the saw?

"*A.* Oh, it might be, it couldn't have been any more than two inches away.

"*Q.* How about the two fingers, six inches away, wouldn't they, from the saw?

"*A.* About that; yes.

"*Q.* And your thumb would be nearer the saw, of course?

"*A.* Yes.

"*Q.* You knew the danger of sawing this board on that ripsaw that morning with the guard up? You knew there was danger in it?

"*A.* Yes.

"*Q.* And you continued to saw those boards the same way that two or three days you were there?

"*A.* Yes, sir.

"*Q.* With the knowledge of the danger?

"*A.* Yes.

"*Q.* And the danger with the guards up was what? How would the danger be?

"*A.* You would get your hand on the saw through there.

"*Q.* With the guard down you couldn't get your hand on the saw unless you ran it under the guard?

"*A.* That is all, about.

"*Q.* You couldn't do that unless you done it purposely?

"*A.* I don't know about that.

"*Q.* As the board went through, in order to get your hand or finger on the saw, you had to get in below the guard for 2 or 3 inches, wouldn't you?

"*A.* Yes.

"*Q.* So you had to shove your hand under in some way?

"*A.* Yes.

"*Q.* And that, of course, you wouldn't do. Now, then, you neither tried to put down the guard— You didn't try to put down the guard?

"*A.* No, sir.

"*Q.* You didn't say anything to anybody that the guard should be down?

"*A.* No, sir.

"*Q.* Simply went on and done that work with the knowledge of the danger? You were liable to have your fingers cut with operating the saw with the guard up?

"*A.* Yes."

Redirect examination:

"*Q.* Is this guard here offered for illustration similar to the other one?

"*A.* Yes.

"*Q.* Does it operate the same as the other?

"*A.* I don't know. It had a screw to the hood; that is all I know of. I do know that the guard is kept in place by a bolt running through there.

"*Q.* That is identically the same as the one you worked upon?

"*A.* As far as the hood is concerned.

"*Q.* That was on hinges up and down?

"*A.* Yes, sir. That other one must have been broken, because there was a piece of wood in there. It was right in the hinge. That is why I didn't do anything about it. It looked as though they put it up there to hold it there. I didn't try to put it down in any event. Mr. Chapman directed me to work on this ripsaw. It wasn't Mr. Duboi. He told me to go over and work for Chapman in the cutting room. I don't know that Mr. Wm. Duboi worked on that machine that day before I did. He wasn't the last man to work upon it.

"*Q.* You don't know of your own knowledge?

"*A.* I am quite sure. Mr. Chapman didn't go with me to this ripsaw. He said I should go over there and rip on this ripsaw, and that is all the directions he gave me about it."

The guide on the left hand was 2 inches from the saw, and allowed a strip 2 inches wide to be cut from the board. The other portion of the board was 7¾ inches wide. When the board had passed the saw, the standard which came up through the table and to which the guard was attached entered the kerf made

by the saw, and acted as a spreader between the wide part of the board and the strip which was being taken off. The board also passed under the joint in the guard, and this would be true whether the front part of the guard is lifted or not. It is clear that to push the board through it was not necessary to get any portion of the hand within 3 inches of the saw.

A reading of the testimony of the plaintiff indicates that he does not know how the accident happened. An examination of the board and of the photographs gives rise to a fair inference that the saw did its work readily as it entered the soft pine until it struck the hard pine knot, which made it necessary to exert much more strength to push the board forward until the knot was sawed through, when, if the pressure was continued, the saw would cut the remaining portion of the soft pine very rapidly, and if the fingers of the plaintiff were in the line of the saw they were likely to be cut off. It is not a far-fetched inference to say that this is what probably happened. If the guard had been down, the hand could not have reached the saw. If the board had been properly pushed through, the injury could not have happened. If plaintiff had not himself been negligent, he would not have been hurt. We think, in principle, the case is controlled by the case of *Beghold* v. *Auto Body Co.*, 149 Mich. 14 (112 N. W. 691, 14 L. R. A. [N. S.] 609), and the many cases cited therein.

The verdict should have been directed in favor of defendant as requested. This makes it unnecessary to discuss the other assignments of error.

The case is reversed, and a new trial ordered.

STEERE, C. J., and MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.